**UNITED STATES of America, Plaintiff,**

v.

**70.39 ACRES OF LAND, more or less, in the County of San Diego, State of California, et al., Defendants.**

Civ. No. 1506–SD.

United States District Court
S. D. California, S. D.

July 10, 1958.

Laughlin E. Waters, U. S. Atty., Joseph F. McPherson and Albert N. Minton, Asst. U. S. Attys., Los Angeles, Cal., for the United States.

Hill, Farrer & Burrill, Los Angeles, Cal., and Luce, Forward, Kunzel & Scripps, San Diego, Cal., for Charles W. Carlstrom.

Paul, Hastings & Janofsky, Los Angeles, Cal., for Southern Cal. Dist. Council of the Assemblies of God, Inc.

Procopio, Price, Cory & Schwartz, San Diego, Cal., Paul, Hastings & Janofsky, Los Angeles, Cal., for Southern Cal. Children's Aid Foundation.

Hill, Farrer & Burrill, Los Angeles, Cal., and Rubin & Seltzer, San Diego, Cal., for The Salvation Army, a N. Y. Corp.

Thomas P. Moran, San Diego, Cal., for General Dynamics Corp., a Delaware Corp.

Oakes & Horton, San Diego, Cal., for Business Properties Inc., a successor in interest to Gregory Electric Co.

James W. Archer, Ward W. Waddell, Jr., and Alfred Lord, San Diego, Cal., and Jones and Bednar, Los Angeles, Cal., for Lyon Van & Storage Co.

Robert W. Walker, John J. Balluff, Los Angeles, Cal., and Charles H. Forward, San Diego, Cal., for Atchison, Topeka and Santa Fe Ry., and Santa Fe Land Imp. Co.

JAMES M. CARTER, District Judge.

This condemnation case, involving industrial lands and buildings within the city of San Diego, was tried to a jury. The jury were selected on January 2nd and 3rd, and the trial continued to and actually commenced, on January 22, 1957. The trial proceeded continuously, except for a lapse of two weeks caused by the death of a leading member of the Bar, one of counsel in the case, and terminated in a verdict on May 27, 1957. At that time the transcript of the trial numbered 7,493 pages.

An industrial plant termed the "Plancor," had originally been assembled and constructed by the United States government for the use of Convair, a manufacturer of air planes during World War II. Following the conclusion of the war, there was public clamor for disposition of alleged surplus property.

There were several sales made of portions of the original assembly. A large area of land and several buildings were sold to the County of San Diego. Small segments were sold to the Veterans Administration and others, and a portion

of the original assembly containing five to six buildings was never sold and still remains the property of the government.

The portion of the Plancor, consisting of three immense assembly buildings, the drop hammer building, and several smaller ones, and a large parking lot were offered for sale. The government had difficulty finding a buyer and finally on May 4, 1948, this portion of the original Plancor was sold to Charles W. Carlstrom for $1,050,000. This is the portion of the Plancor later condemned by the government and involved in this proceeding.

There followed the Korean incident and the increased activity of the Air Corps in connection with scientific advancements involving jets, guided missiles, etc. Convair required increasing space, and from time to time entered into leases with Carlstrom for portions of the property.

On April 29, 1953, the government, by declaration of taking, took a fourteen month's term with the right to renew from year to year until June 30, 1958. Prior to the expiration of the fourteen month term, which ended June 30, 1954, the government elected to extend the term, to and including June 30, 1955. In May of 1955, the government gave notice of its election to further extend the term to June 30, 1956, but before that extension began, and on June 16, 1955, the government filed in this proceeding a declaration of taking, with accompanying deposit, for the acquisition of the fee estate subject only to easements for highways, utilities, and pipelines.

Following the government's initial taking of the term for fourteen months, and before its fee taking, there were numerous transfers of portions of the fee of the property. The term taking and the fee taking were effected in the same proceeding, and during pretrial there were involved a vast number of legal problems which set the case apart as far more complex than the average condemnation case. These problems involved the effect of the government's takes, rights of lessors and lessees, the effect of the subsequent transfers of the fee, and a myriad of problems which only able counsel, spurred on by the prospect of a verdict running into the millions, could dredge up by detailed and efficient research.

Judge Peirson M. Hall had originally undertaken the case at a time when a second judge in the Southern Division (San Diego) was serving by rotation. Upon the assignment of Judge CARTER to the Southern Division as the second permanent judge, in April 1956, the case was transferred to him. At that stage of the proceedings, there had been prepared a series of questions of law to be submitted to the court for rulings prior to trial. They were as follows:—

1. What is the proper "unit" of value, i.e. should the entire tract be considered a unit for valuation purposes, or should separate fee parcels be separately valued?

2. Should value or compensation be determined before questions of ownership? (aside from the right of occupancy).

3. What rights or parking privileges, if any, do the respective defendants have in the so-called Parcel 10–A?

4. What is the proper measure of just compensation?

5. How is the value of the option to renew to be determined?

6. Do subsequent purchasers have the right to appear and present evidence?

7. Do lessees have the right to present evidence?

8. Does the lessee (Convair), which also became the lessee of the government after the taking, have the right to introduce evidence?

9. Should oral grants be shown on the map and should the holders of such grants be permitted to introduce evidence?

10. Can removal costs and loss of going concern value be proved where less than the unexpired lease term is taken?

11. Should rental compensation be reduced as to those who remained in possession after the taking? If so, when should this adjustment be made?

12. Were the leases terminated by the taking?

13. What is the proper forum for determining disputes as to the leases, etc.?

As a result of prior hearings before Judge Hall, there had been evolved a proposed pretrial order on the *leasehold taking*, and this proposed order had been served upon and studied by all counsel.

Upon taking over the case, extensive pretrial hearings were had. The court eventually wrote various memoranda of law and made various pretrial orders, disposing of most of the legal problems before trial. The court is indebted to Judge Hall for his efficient preliminary work in the matter.

Various legal memoranda have been grouped herein under the respective portions of the pretrial orders to which they pertain; and in addition to the four formal pretrial orders, there are included other pretrial rulings on matters of law.

## The Verdicts

The court had ruled that the extended period of the term taking for the twelve months from July 1, 1954 to June 30, 1955, would not be submitted to the jury but would be computed at 12/14ths of the amount of the verdict for the period of fourteen months from May 1, 1953, to June 30, 1954. This ruling, hereafter discussed, was based on the ground that the option to renew must be separately valued and paid for and that therefore the term renewal was to be valued at the same rate as the original term.

The court therefore required the jury to return a verdict as to the value of the fourteen months' term take, another verdict as to the value of the *option right* and a third verdict as to the value of the fee taken.

There was a contention in the case by the defendants that the various parcels both on the term take and on the fee take were reasonably subject to unitization, and that as a unit the combined parcels had a greater fair market value than if appraised separately. The court therefore required the appraisers to be ready to testify as to the fair market value of the parcels, individually and to the fair market value of the parcels as unitized. But in order to determine which measure the jury used, the court submitted three special interrogatories or questions to the jury, which were answered as follows:

## Questions

"*As To Term Taking*

"In the term and option taking, was there a reasonable probability of the unitization of all the parcels except parcel 1, as of the date of the taking on May 1, 1953, or in the reasonably near future thereafter?

"Yes————
"*As To The Fee Taking*
"No X

"(1) In the fee taking, was there a reasonable probability of the unitization of all the tracts in the fee taking *except* Tract A–100 at the date of taking on June 16, 1955, or in the reasonably near future thereafter?

"Yes X
"No————

"(2) In the fee taking, was there a reasonable probability of the unitization of all the tracts, *including* Tract A–100 on the date of taking on June 16, 1955, or in the reasonably near future thereafter?

"Yes X
"No————
"Dated May 27, 1957. Signed
G. Campbell Janney,
Foreman of the jury."

A discriminating jury found that the parcels in the term taking were not subject to unitization, but that the parcels in the fee taking were subject to uniti-

zation, either excluding Tract A–100 or including Tract A–100. Separate counsel had represented the owners of Tract A–100. The drop hammer and drop hammer building were located on this Tract and the facility was a necessary and integral part of the metal fabrication carried on by Convair during its war time use of the Plancor. During the subsequent period of private ownership, the building had been converted to a storage warehouse, and at the time of taking, on April 29, 1953, was under long term lease for such commercial purpose.

Because of the foregoing facts the issue on unitization was submitted in the alternatives above.

The verdicts were as follows:—

### Term Taking

| Par No. | Fair Mkt. Val. of 14 Mo. term (fixed by jury) | Fair Mkt. Val. of 12 Mo. Renew. (computed) | Fair Mkt. Val. of Opt. to ren. (fix. by jury) | Port. verd. for 14 Mo. term which is enhancement because of Park Priv. (fix. by jury) |
|---|---|---|---|---|
| 5 | $ 62,000.00 | $ 50,928.55 | $17,712.00 | $ 1,600.00 |
| 6 | 185,000.00 | 151,964.24 | 52,856.00 | 8,600.00 |
| 7 | 202,000.00 | | | |
| 9–A | 315,000.00 | 258,749.92 | 90,000.00 | 10,850.00 |
| 9–B | 700.00 | 575.00 | 200.00 | 100.00 |
| X | 12,000.00 | 9,857.14 | 3,428.00 | 405.00 |
| | 776,700.00 | 638,003.38 | 221,880.00 | 31,105.00 |

### Fee Taking

| Tract No. | Fair Mkt. Value as of 6/15/55 (fix. by jury) | Portion of Verd. which is enhancement because of Park. Privilege (fix. by jury) |
|---|---|---|
| A–100 | $ 275,000.00 | $7,500.00 |
| A–101 | 1,146,000.00 | 49,600.00 |
| A–102 | 2,830,000.00 | 111,500.00 |
| A–106 | 30,000.00 | 700.00 |
| A–107 | 49,000.00 | 1,300.00 |
| A–108 | 122,000.00 | 2,400.00 |
| A–109 | 195,000.00 | 5,400.00 |
| A–120 | 22,000.00 | 300.00 |
| A–121 | 208,000.00 | 1,700.00 |
| Totals | 4,807,000.00 | 180,400.00 |

The totals are as follows:

*Term taking*

| | |
|---|---|
| 14 Mos. | $776,700.00 |
| 12 " | 638,003.38 |
| Option | 221,880.00 |
| | $1,636,583.38 |
| *Fee Taking* | 4,807,000.00 |
| | $6,443,583.38 |

In addition to the verdicts on the Parcels and Tracts submitted to the jury, several Tracts and Parcels were settled at various times before the jury's verdict. These included Parcels 1, 9–C and 10–A of the term acquisition and Tracts B–200, B–201, and A–110 to A–119 inclusive of the fee acquisition.

The amounts paid on the Tracts and Parcels settled before verdict, taking into account the area and improvements closely approximated the verdicts later returned by the jury on other Tracts and Parcels, and are accordingly set forth hereafter.

| | |
|---|---|
| Parcel 1, term taking (same property as Tract A–100 in fee) | $ 76,552.07 |
| Parcel 9–C, term taking | 14,880.00 |
| Parcel 10–A, " " (Midway) | 23,034.15 |
| Parcel 10–A " " (Ace Van) | 1,552.85 |
| Tracts A–110–119, fee taking | 69,300.00 |
| Tract B–200 " " (Ace Van) | 61,750.00 |
| Tract B–201 " " (Midway) | 617,500.00 |

---

There follow the pretrial orders, and the memoranda of the court filed in connection therewith. For convenience, pretrial order No. 2 on the leasehold taking will be called *"Lease Order No. 2"* and pretrial Order No. 3, on the fee taking will be called *"Fee Order No. 3."*

### Pretrial Order No. 1 (6/21/56)

"It Appearing that the United States may concede that certain parcels of land owned by certain land owners may be considered as separate parcels for the purpose of evaluation, even though the said land has not been set forth as a separate parcel in the complaint or amended complaint; and it being necessary that appraisers employed by the parties may know what parcels are to be appraised;

"It Is Ordered that the United States, on or before July 16, 1956, either (1) file further amendments to the complaint, or (2) in the alternative, by such date, advise (the court and) counsel of the description of such parcels which may be considered as units, and thereafter, prior to trial, prepare the amendments describing the parcels.

"Dated: June 21, 1956.

"James M. Carter
"United States District Judge"

### Pretrial Order No. 2 (8/10/56)

"As to the questions of law presented upon pretrial with respect to which the parties seek an order in advance of the trial, the court will rule upon the trial, in the absence of controlling precedents to the contrary and subject to modification at the trial to prevent manifest injustice, as follows:"

*Public Use*

I. (Lease Order No. 2)
"The use for which the plaintiff condemned the term taken herein, pursuant to the Declaration of Taking and the Complaint filed April 29, 1953, is a public use and the plaintiff has the lawful right to take and acquire the term and estate set forth in said Complaint and said Declaration of Taking." [1]

1. Paragraph I of Fee Order No. 3 is similar except as to the estate taken and the date of taking. Fee Order No. 3 was filed 12/27/56.

### What Was Taken
### II. (Lease Order No. 2)

"The estate so taken by the said Declaration of Taking for said public use is a term for years commencing May 1, 1953, and ending June 30, 1954, extendible for yearly periods thereafter at the election of the United States until June 30, 1958, notice of which election shall be filed in the proceeding at least thirty (30) days prior to the end of the term thereby taken, or subsequent extensions thereof, together with the right to remove within a reasonable time after the expiration of the term taken, or any extension thereof, any and all improvements and structures placed thereon by or for the United States of America, subject, however, to existing easements for public roads and highways, public utilities, railroads and pipe lines, and to such rights and reservations as are set out in Schedule 'A' attached to the Declaration of Taking and made a part thereof."

### II. (Fee Order No. 3)

"The estate so taken by the said Declaration of Taking for said public use is the fee simple title, subject to existing easements[1a] for public roads and highways, public utilities, and railroads, effective as of June 16, 1955. In this connection the Court rules that the plaintiff in the leasehold taking herein by the filing in these proceedings of the original Declaration of Taking filed April 29, 1953, and the Notice of Election to extend the term taken filed May 19, 1954, and May 31, 1955, effectively extended the leasehold taking to June 30, 1956; further in this connection the Court rules that upon the filing of the Declaration of Taking of the fee on June 16, 1955, the then existing leasehold for the period July 1, 1955, to June 30, 1956, was thereupon merged into the fee. The Court further rules that any payment for the leasehold taking for the period of June 17, 1955, to and including June 30, 1955, constitutes an unjust enrich-

ment to the defendants who receive the same, and some stipulation or order must be entered into or made to provide therefor."

### Memorandum

### I.
### The Declaration Of Taking, The Complaints And The Questions Presented Thereby.

In the original complaint filed April 29, 1953, and the Declaration of Taking filed the same date, the language as to the taking is substantially the same and reads, "a term for years commencing May 1, 1953 and ending June 30, 1954, extendable for yearly periods thereafter at the election of the United States until June 30, 1958, notice of which election shall be filed in the proceeding at least thirty days prior to the end of the term hereby taken or subsequent extensions thereof, together with the right to remove" improvements, etc., * * *

On May 19, 1954, Notice of Election was given to extend the term in the following language:

" * * * United States * * * pursuant to the privilege of election vested in said plaintiff by the declaration of taking on file herein, hereby elects to extend the term of exclusive possession and use of the property which was condemned in the above entitled proceeding for an additional period of one year, commencing July 1, 1954 and ending June 30, 1955."

On July 30, 1954, a supplemental Declaration of Taking was filed but it contained merely a recital concerning the election and an estimate of the just compensation for the additional term of one year, commencing July 1, 1954, and ending June 30, 1955. We pass it as adding nothing to the original Declaration of Taking.

The First Amendment to the Complaint and the "Amendment to Declaration and Supplemental Declaration of Taking," each dated March 24, 1955,

---

1a. The estate taken was later modified as to easements, by stipulation of the parties and is shown as modified in the final judgment.

only corrected an error in the description of certain parcels. We pass them also as not being of significance to our problem.

On May 31, 1955, Notice of Election to extend the term for an additional year commencing July 1, 1955, and ending June 30, 1956, was given in identical language as the prior Notice of Election, except for the period of the term.

On June 16, 1955, the "First Amended Complaint in Condemnation" was filed and it described the estates to be taken as follows:

(a) "A term of years commencing May 1, 1953, and *ending with the filing of this First Amended Complaint*" and the Declaration of Taking filed the same day, and

(b) Upon the *conclusion of the exclusive use and occupancy described in subparagraph (a) above*, the estate taken is the fee simple title subject to existing easements * * *".

Objection was heretofore made by defendant land owners concerning the language of the First Amended Complaint and the Declaration of Fee Taking. The objection was justified in that in substance the government attemped to end the term taking with the filing of the First Amended Complaint on June 16, 1955. Thereafter, on August 23, 1955, the government filed an Amendment to the First Amended Complaint reading as follows:

"5. The estates in the property to be acquired for said public uses * * * are as follows: (a) A term for years as more particularly described in paragraph 3 of the Declaration of Taking filed herein on April 29, 1953, under which said Declaration of Taking the right of use and occupancy was thereafter extended; (b) The fee simple title in and to the properties described in the original Complaint in Condemnation, as amended by the First Amendment to Complaint in Condemnation filed March 24, 1955, the First Amended Complaint in Con-

demnation, and Declaration of Taking filed herein, subject, however, to existing easements * * * effective upon the filing of the said declaration of fee taking, to-wit, June 16, 1955."

This amendment temporarily solved the dilemma and cured the defects in the First Amended Complaint, but it left open the questions we must now decide, namely,

(1) when did the government's fee taking become effective?

(2) what did the government take by way of term?

We pass the second question until after we dispose of the fee and option problems.

## II.

The Government's Fee Taking Was Effective On June 16, 1955, Subject To An Existing Term.

■■ On June 16, 1955, there is no dispute that the government had an existing term in the property, regardless of the election filed May 31, 1955. The government's term, by virtue of the prior election of May 19, 1954, ran to June 30, 1955. Thus, there was still two weeks of that term left when the First Amended Complaint and the Fee Taking Declaration was filed on June 16, 1955. The court has no doubt that the government, having taken a term for years, may thereafter take the fee. What the government decides to take is a matter solely within the prerogative of the Executive Department rather than the Judiciary, Old Dominion Land Co. v. United States, 1925, 269 U.S. 55, 46 S.Ct. 39, 70 L.Ed. 162; Mead v. City of Portland, 1906, 200 U.S. 148, 26 S.Ct. 171, 50 L.Ed. 413. The United States can "always acquire a greater interest in the property than it already possessed," United States v. 6.74 Acres of Land in Dade County, Florida, 5 Cir., 1945, 148 F.2d 618, 620.

■ Nor does the taking of the fee by the government on June 16, 1955. subject to the term estate it already

owned and possessed, run contra to the cases relied upon by the defendants, United States v. Bauman, D.C.Or.1943, 56 F.Supp. 109; United States v. 16,572 Acres of Land, More or Less, D.C.S.D. Tex.1942, 45 F.Supp. 23; United States v. Sunset Cemetery Co., 7 Cir., 1943, 132 F.2d 163; Catlin v. United States, 1945, 324 U.S. 229, 65 S.Ct. 631, 89 L.Ed. 911. The taking on June 16, 1955, was not an attempt to diminute the term ending June 30, 1955, which had already been taken, without the consent of the parties or court in contravention of 40 U.S. C.A. § 258(f), nor an attempt to *enlarge or vary the term taking*, but was in effect a new taking of a new estate, that is the fee subject to an existing term already held by the government. It was therefore not an attempt to amend the original taking.

The court concludes that on June 16, 1955, by the First Amended Complaint and by the Declaration of Taking, the fee, subject to the existing term in the government, was taken. We discuss later whether that term ran to June 30, 1955 or to June 30, 1956.

### III.

### Method of Valuation of The Option and The Term Estate.

The method to be used in valuation in this case presents a difficult problem as to the option and the term estate. The three major defendants have proposed three different methods of valuation, and the government, a fourth method.

1. Mr. Janofsky, representing the Children's Aid Society and Assemblies of God, urges that there be determined the fair market rental value for the first fourteen months, as of May 1, 1953, including as an integral part, the value of the option to renew affecting the property until June 30, 1958. That the same method be used as of July 1, 1954, to evaluate the fair market rental value of the first option year, July 1, 1954 to June 30, 1955, that is, include as an integral part, the value of the option. And that the same method be used for the second option year July 1, 1955 to June 30, 1956, but valuation to be placed as of July 1, 1955.

2. Rubin and Seltzer, representing the Salvation Army urge that the method be as follows: Ascertain the fair market rental value for the first fourteen months, including as an integral part thereof the value of the option to renew. That the rental for any extended term, or terms, shall be fixed as of May 1, 1953, but not necessarily at the same rate as that for the original term. Apparently Rubin & Seltzer would value the option only once, but would value the terms separately, all as of May 1, 1953. This approach differs from Janofsky's, in that Janofsky would value the option at the beginning of each term as part of the fair market rental value of the term.

3. Mr. Burrill, representing defendant Carlstrom, would ascertain the fair market value for the first fourteen months' term and include as an integral part thereof, the value of the option to renew. The rental value for extended terms would be at the same rate per year, i.e. $\frac{12}{14}$ths of the value fixed for the first term. This would inferentially include the value of the option, in the value fixed for each additional term.

4. Mr. McPherson, representing the government, on the other hand urges that two separate valuations be made. *First;* That the fourteen months' term be valued and that the annual rate for additional terms be thereby fixed, that is, twelve-fourteenths of the amount fixed for the first fourteen months' term; and urges that since the government could separately condemn a term on each July 1st, there was no object in taking an option or no real consideration for the government's payment for an option unless there existed a right for the renewal of the term at the same rental basis. *Secondly,* the government says that the option to renew is to be separately valued, as it affected the property until June 30, 1958, and just compensation therefor is payable whether or not the option was in fact exercised.

There are no authorities squarely in point on these propositions. We are impressed by re-reading various of the Supreme Court decisions, United States v. General Motors Corp., 1945, 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311; United States v. Petty Motor Co., 1946, 327 U.S. 372, 66 S.Ct. 596, 90 L.Ed. 729; and United States v. Westinghouse Elec. & Mfg. Co., 1950, 339 U.S. 261, 70 S.Ct. 644, 94 L.Ed. 816, that the Supreme Court has approached similar condemnation problems largely on a basis of logic and common sense and with an intent to apply the general principles of property law to the particular problems. We think there is no alternative but to adopt the same approach to our problem. We start therefore with general principles:

(1) The option right, which the government has taken, has resulted in contingently tieing up landowner's property to a future date of June 30, 1958. For this the government concedes it must pay just compensation, whether or not the option was exercised.

(2) The government has taken and used the fourteen months' term and all but two weeks of an extended term of one year. Certainly for the first and second year terms (minus two weeks) the government must pay just compensation.

(3) The government elected on May 31, 1955 to take a third year term, but before it went into possession and occupancy, which would have begun on July 1, 1955, it filed on June 16, 1955, a taking of the fee. *Query:* Whether the government must pay for the use and occupancy of a third year term which it claims it never used and occupied. The query is made more important by the fact that we start with the premise that the government must pay for the option, whether fully exercised or not.

### A. The Effect of The Option To Renew

■■■ Passing for a moment, the *valuation* of the option, we are of the view that the option to renew had the effect of permitting the renewal of the term, at the government's election upon the same rate of rent as the previous term. We base this conclusion on the following line of reasoning: The power of eminent domain is an inherent attribute of sovereignty, is inexhaustible and may be exercised as often and as many times and at such periods as may be necessary to discharge and perform a Congressional mandate to accomplish the public use authorized and directed. The government therefore, without an option, could have taken a term for fourteen months beginning May 1, 1953 and subsequently by a separate taking, taken a term for one year, beginning July 1, 1954 and successive terms thereafter as long as it desired. What therefore, was the reason and purposes of taking an option to renew the terms upon the filing of an election? The option would be meaningless unless it is to be held that the rental for the renewed term was at the same rate as the previous term. Secondly, the government must pay a consideration for the option, as we have already stated. It must pay just compensation for that option. What consideration would there be for the government's option and for the monies paid therefor, unless it was a premium for the privilege of exercising the right to continue occupancy at the rental first established?

There is little in the books that help us on this matter. There is a sentence in United States v. Westinghouse Elec. & Mfg. Co., 1950, 339 U.S. 261, at page 265, footnote 3, 70 S.Ct. 644, at page 647, reading, "Problems relating to the valuation of renewal options are not before us on this record. It need hardly be said that provision for renewal does not necessitate the same rental for the renewed period as for the initial period * * *". The problem was not before the court and the statement appears only in the footnote, and certainly is not controlling.

Jackson, in his dissent in the same case, approached the problem in more detail, stating, "The United States needs no such option, for its inherent condem-

nation power, by its very nature, is a perpetual option to take, at any time, any property it needs * * *". He then proceeded, "If, let us say, the price level should fall, the Government, even though it wants the property, is not bound to keep it on the option terms * * * it may abandon the option and take the property under a new declaration, thereby getting a new valuation in the light of the lower price level. *If, however, prices go up, the Government can use its condemned option to keep the owner from enjoying the rising value of his property* as other owners may do. The taking of a term with an option to lengthen is therefore no more than a hedge against inflation." 339 U.S. at page 272, 70 S.Ct. at page 650. [Emphasis supplied.]

We submit that Jackson's approach is far more realistic than the single sentence in footnote 3, and it is in accord with the ordinary commercial and real property view as to the nature of an option. " 'A general covenant to extend or renew implies an additional term equal to the first, and upon the same terms, including that of rent, except the covenant to renew; to include which would make the lease perpetual.' Taylor's Landlord and Tenant, § 332; 16 R.C.L. 887 * * * ", Penilla v. Gerstenkorn, 1927, 86 Cal.App. 668, at page 670, 261 P. 488, at page 489.

The case relied upon by the defendants, United States v. Certain Parcels of Land, D.C.Md.1944, 55 F.Supp. 257, in turn relied upon the earlier case, United States v. 16.747 Acres of Land, D.C.Del.1943, 50 F.Supp. 389, 391. In the earlier case the court said, "Certainly an expert appraiser can determine a fair annual rental, determined as though the government had rented the property for a year with an option to renew from year to year * * * ", and followed this by a quotation from Johnson v. United States, 4 Ct.Cl. 248–250, *"The amount thus found may be regarded in future as the established and agreed rent of the premises as long as the govern-ment shall elect to occupy under the implied lease.' "* [Emphasis supplied.]

We conclude that what the government is paying for, when it takes the option, is the right to a renewal of the term at the same rental. Nor can the defendants who owned the land on May 1, 1953, be hurt by this ruling, for the jury will be told that the rent they fix for the first fourteen months' term will determine the rent which the government must pay for additional years of renewal of the lease on a basis of $^{12}/_{14}$ths of what is allowed for the first term; and the jury will be told that for this privilege, of renewal at the same rental, the government is paying for an option which runs until 1958; and that the defendants are entitled to just compensation, that is a fair market value, as of May 1, 1953, of that option, which has the effect just enumerated, and just compensation for the option, whether it is exercised or not. Thus, the jury in awarding compensation, may fix in the award for the option, that amount of money which will compensate such defendants for the fact that their propery is tied up on a renewable term at a fixed rental.

But land owners who became purchasers, subsequent to the May 1, 1953 taking of the option, say they are hurt; that such a ruling gives all the option money to the original fee owner and leaves them only the rental value of the term taken. The answer to this is that such subsequent purchasers took the property, subject to the rights the government had acquired on May 1, 1953 and with notice thereof. The option money is being paid because this will represent just compensation to the *then land owner* for the option taken which contingency tied up and encumbered his property to June 30, 1958, and which gave the government the right to renew the term at its sole election on the same rental as the first term. The option right was taken only from the land owners of May 1, 1953 and not from the subsequent purchasers of the fee.

### B. Should The Option Be Valued Separately Or As Part Of The Award For The Term.

■ Again we approach the problem largely on a basis of logic, with what little help we can gather from the cases. In United States v. General Motors Corp., 1945, 323 U.S. 373, at page 377, in footnote 3, 65 S.Ct. at page 359, the court said, "The case now presented involves only the original taking for one year. If, on remand, the case be treated as involving the Government's option of renewal, the additional value of that interest must be included in the *compensation awarded*." [Emphasis supplied.]

It will be noted the court did not say that one lump sum must be awarded for the term and the option, but that the value of the option must be included in the award.

It is true that in the same case, in speaking of the elements of removal damage, re labor, materials, transportation and storage, as affecting fair market value for a lease, the court said, "Such items may be proved, not as independent items of damage but to aid in the determination of what would be the usual—the market—price which would be asked and paid for such temporary occupancy of the building then in use under a long term lease," 323 U.S. at page 383, 65 S.Ct. at page 362. But in the same case, in speaking of the tenant's right to fixtures and equipment taken, the court said, "In respect of them, the tenant whose occupancy is taken is entitled to compensation for destruction, damage or depreciation in value. And since they are properly distinct from the right of occupancy such compensation should be awarded not as a part of but in addition to the value of the occupancy as such," 323 U.S. at page 384, 65 S.Ct. at page 362.

In United States v. Westinghouse Elec. & Mfg. Co., 1950, 339 U.S. 261, at page 268, 70 S.Ct. 644, at page 648, 94 L.Ed. 816, the court said, "Even in the cases where the event is still open, the cost of moving out, insofar as it is to be reflected in just compensation, may be treated as a *segregated item*." [Emphasis supplied.]

We do not think it is a matter of substance, whether the option right is valued separately from the term or as a part of it, so long as the ultimate award reflects a consideration of and an allowance for both the option and the term. In this case it would seem more logical, more workable and more just to have the option separately valued from the term and then include both in the final award. Such a procedure meets the requirements stated by Judge Fee, in United States v. Bauman, supra, 56 F.Supp. at page 118:

> " * * * What has been said establishes the fact that a stipulation permitting the United States to renew this lease from year to year in perpetuity without the consent of the landowner constitutes *the taking of a valuable property interest at the present time, for which just compensation must be paid in the proceeding*." [Emphasis supplied.]

Furthermore, such a procedure obviates the vice in the suggestions made by Mr. Janofsky, who would have the option valued each time there was a renewal of the term; the vice in the suggestion of Rubin and Seltzer, that the option be valued as a part of the first term taken but that the rental for additional terms need not necessarily be at the same fixed rate; and the vice in the suggestion of Mr. Burrill that the option be valued as part of the first term taken and that each additional term be valued at $^{12}\!/_{14}$ths of the amount first fixed, which of course included the option right and therefore the result is that the option right is valued in each of the succeeding terms.

There is a further vice in the suggestion of the defendants, which we obviate by the method herein determined.

Mr. Janofsky's method would only value the option as *part of each term taken*. Thus he would value it on May 1, 1953, July 1, 1954 and July 1, 1955.

Actually the *option taken* gave further rights of renewal of the term on July 1, 1956, and July 1, 1957. On each of the first three dates he would value the option as including the right "to renew for yearly periods to June 30, 1958."

Thus, you have either duplicating valuations of the option or possibly no valuation for the right to exercise the option on July 1, 1956 and July 1, 1957. True, on appeal defendants could not complain of an erroneous method urged upon and adopted by the court, but bad law might result.

Mr. Burrill's method definitely results in duplicating the value of the option and makes no provision for valuing the right to extend on July 1, 1956, and July 1, 1957.

The court concludes that the option right should be valued separately from the term as of May 1, 1953 but included in the general award of compensation. By this method, the defendants are paid for the *term taken,* and paid for the *option taken,* whether used or not.

## IV.

What Term Did The Government Take? Should The Defendants Receive Compensation For The Term From July 1, 1955 to June 30, 1956?

### A.

#### The Problem and The Contentions

The more difficult problem is what was the term taken by the government as affected by the fee taking on June 16, 1955? Reading the original complaint and the original Declaration of Taking, it involved a term for years commencing May 1, 1953, extendable at the election of the United States until June 30, 1958. Nothing remained for the government but to give notice of elections to extend for yearly periods, at least thirty days prior to the end of the first term taken, or 30 days prior to the end of the subsequent year terms taken.

After such original taking, the United States on May 19, 1954, " * * * *pursuant to the privilege of election vested* *in the plaintiff by the Declaration of Taking on file herein,"* (obviously referring to the Declaration of Taking of April 29, (1953), elected to take the additional year. We have already commented that the Supplemental Declaration of Taking filed July 30, 1954, was nothing but a further estimate of compensation. On May 31, 1955, the second election was exercised by use of language identical to the first election. There is no dispute by any of the parties that there was still in existence approximately two weeks of the second term.

Defendants now contend that the taking of the third year term was completed upon the notice of election of May 31, 1955, although the money or compensation for the term was not due and payable until July 1, 1955; that the election on May 31, 1955 did everything provided for in the original declaration of taking to make the third year term effective; that therefore the government has taken the term and cannot, by the fee taking, cut down the term previously taken; that the defendants are entitled to a third year's rent which must be valued and compensation awarded; and that if the fee taking was effective on June 16, 1955, the fee must be valued, not as a fee absolute but as a fee less the third year term already taken.

The government, on the other hand, contends it never went into the use and occupancy of the third year term; that it had merely filed its election to renew under the option and that it should not therefore pay for the third year term; that in any event, if it took the third year term, then a merger has taken place; that the third year term, if it was taken, merged with the balance of the fee taken; that the government, in substance, becomes its own landlord for the third year which the government says is an impossibility.

### B.

#### Was The Third Year Term Taken?

(a) The effect of the election of May 31, 1955.

The government concedes it took an option to renew the term. California lease and option law, we think, assists in our problem.

■■ To avail itself of an option for renewal, "a tenant must apprise the lessor in unequivocal terms of his unqualified intention to exercise his option in the precise terms permitted by the lease. 32 Am.Jur., sec. 979, p. 822. See, Braun v. Leo G. MacLaughlin Co., 93 Cal.App. 116, 120–121, 269 P. 191 * * * An option is an offer by which a promisor binds himself in advance to make a contract if the optionee accepts upon the terms and within the time designated in the option. Since the optionor is bound while the optionee is free to accept or not as he chooses, *courts are strict in holding an optionee to exact compliance with the terms of the option*," Hayward Lumber & Investment Co. v. Construction Products Corp., 1953, 117 Cal.App.2d 221, 228–229, 255 P.2d 473, 477. (Emphasis supplied.)

■ "Where a lease gives to the lessee the option of a renewal for a given term at the same rental, undoubtedly a notice of election given in time is sufficient to extend the term. Andrews v. Marshall Creamery Co., 118 Iowa 595, 92 N.W. 706, 96 Am.St.Rep. 412; Ewing v. Miles, 12 Tex.Civ.App. 19, 33 S.W. 238; Wiener v. Graff, 7 Cal.App. 580, 95 P. 167. * * *," Bettens v. Hoover, 1909, 12 Cal.App. 313, at page 316, 107 P. 329, at page 331.

"The lessee exercised his right by giving the lessor a written notice to that effect. This was all that was necessary to extend the lease for another term. Howell v. City of Hamburg, 165 Cal. 172, 131 P. 130; Wiener v. Graff, 7 Cal.App. 580, 95 P. 167. * * *," Becker v. Submarine Oil Co., 1921, 55 Cal.App. 698, at page 700, 204 P. 245, at page 246.

We think the election above, was sufficient to extend the term.

(b) The Possession of the Government

■ The government claims it never went into possession of the third term.

"Options for renewal such as that under consideration are generally held to be *in the nature of a present demise for the full period including the renewal period*," Erickson v. Boothe, 1947, 79 Cal.App.2d 266, 272, 179 P.2d 611, 615. (Emphasis supplied.)

The above case has an extended discussion of this problem, and quotes from other cases and texts, 79 Cal.App.2d at pages 272 to 276, 179 P.2d at pages 614 to 617. At page 273 of 79 Cal.App. 2d, at page 615 of 179 P.2d it quotes from Orr v. Doubleday, Page & Co., 223 N.Y. 334, 119 N.E. 552, 1 A.L.R. 338, "The language in question of the lease at bar means that the demise was for ten years absolutely and for ten additional years in case the lessee so elected, and gave the required notice of its election. The lease is a present demise of the premises. The defendant entered into occupation under it. The lessor had no choice or decision in the matter of renewal * * * The only acts called for to effect the renewal are on the part of the defendant * * * A new lease would be useless. The acts of the defendant alone were intended, inasmuch ( ) as the lease enumerates no other act to extend the stipulations of the lease to the occupation through the additional years * * *".

This gist of the cases cited is that upon renewal, (to use the words of a California case cited) "the lease would then become a lease for both the original and extended terms," Wiener v. H. Graff & Co., 1908, 7 Cal.App. 580, 583, 95 P. 167, 169.

We think that upon the election of May 31, 1955 the term was extended to June 30, 1956, and that no new entry into possession on July 1, 1955 was required.

(c) Deposit of Fair Compensation

Nor does the fact that a deposit of estimated fair compensation was to be later made, have any bearing on the

existence of the third term, in view of the government's possession.

■ Upon the election by the optionee, " '* * * [P]ayment or tender is not essential unless it is a condition precedent.' 66 C.J. 500." Murfee v. Porter, 1950, 96 Cal.App.2d 9, 18, 214 P.2d 543, 549. Accord, Cates v. McNeil, 1915, 169 Cal. 697, 705–706, 147 P. 944.

Unless the option contains a condition precedent requiring the payment of money, all the optionee need do to make the option effective, is to give the proper notice, Cates v. McNeil, supra, Lack v. Western Loan & Building Co., 9 Cir., 1943, 134 F.2d 1017, 1021.

Sec. 258a, Title 40 U.S.C.A. requires, as one condition for the passing of title, the deposit of the estimated compensation. Because the term here taken was coupled with an option, it may be possible that the present situation differs from a case where no option was taken and where successive terms were taken by successive declarations of taking. In the latter case, each declaration of taking would have to be accompanied by the estimate and deposit of fair compensation before title to each successive term would pass to the government.

In fact when the second year term was taken, the election to extend the term was filed May 19, 1954, and there was filed on July 30, 1954 a so-called declaration of taking which merely recited the making of the election and estimated the just compensation for the second year term. The government concedes it took the second year term even though the just compensation was not estimated and deposited until at least thirty days after the start of the term.

However, we would not want to fly in the face of Sec. 258a insofar as the passing of *title* is concerned. Suffice it to say, the government *elected* to take the third year term under its original declaration of taking and being already in possession, and the term being merely *extended* (see cases, supra), the government was then in possession of a term running to June 30, 1956.

## C.
### What Was The Effect Of The Fee Taking, On The Term Running To June 30, 1956?

Having held that the government has taken a term running to June 30, 1956, what was the effect of the fee taking on June 16, 1955?

■ The power of eminent domain is an inherent power of sovereignty. The time, manner and method of its exercise are and can be regulated only by the mandate of Congress and by the application of the provisions of the Fifth Amendment.

United States v. Jones, etc., 1883, 109 U.S. 513, 3 S.Ct. 346, 27 L.Ed. 1015; Berman v. Parker, 1954, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27. See Boom Co. v. Patterson, 1878, 98 U.S. 403, 406, 25 L.Ed. 206.

Sec. 258a, Title 40 U.S.C.A., states in part,

"Upon the filing said declaration of taking and of the deposit in court, to the use of the persons entitled thereto, of the amount of the estimated compensation stated in said declaration, title to the said lands in fee simple absolute, * * * shall vest in the United States of America * * *".

(a) Sec. 258a, Title 40 U.S.C.A. is not Modified or Limited by Rule 71A, Rules of Civil Procedure, 28 U.S.C.A.

We must now consider the construction of Sec. 258a, Title 40 U.S.C.A. (Act of Feb. 26, 1931, c. 307, § 1, 46 Stat. 1421) and Rule 71A, Rules of Civil Procedure.

First, the law is clear that §§ 258a to 258e [Act of Feb. 26, 1931, c. 307, §§ 1–5, 46 Stat. 1421] is a supplementary condemnation statute and adds to the other statutes on condemnation, the right of the government to take title immediately upon fulfillment of the conditions set forth in Sec. 258a. The statute so states, Sec. 258d, Title 40 U.S.C.A.

The original report of the Advisory Committee reads in part as follows concerning Rule 71A:

"Rule 71A is not intended to and does not supersede the Act of February 26, 1931, c. 307, §§ 1–5 (46 Stat. 1421), 40 U.S.C. §§ 258a–258e, which is a supplementary condemnation statute, permissive in its nature and designed to permit the prompt acquisition of title by the United States, pending the condemnation proceeding, upon a deposit in court. See United States v. 76,-800 Acres, More or Less, of Land, in Bryan and Liberty Counties, Ga., D.C.S.D.Ga.1942, 44 F.Supp. 653; United States v. 17,280 Acres of Land, More or Less, Situated in Saunders County, Neb., D.C.D. Neb.1942, 47 F.Supp. 267 * * *".

The note to subdivision (i) of Rule 71A concerning dismissal reads as follows:

"Note to Subdivision (i). Both the right of the plaintiff to dismiss by filing a notice of dismissal and the right of the court to permit a dismissal are circumscribed to the extent that where the plaintiff has acquired the title or a lesser interest or possession, viz., any property interest for which just compensation should be paid, the action may not be dismissed, without the defendant's consent, and the property owner remitted to another court, such as the Court of Claims, to recover just compensation for the property right taken. Circuity of action is thus prevented without increasing the liability of the plaintiff to pay just compensation for any interest that is taken. Freedom of dismissal is accorded, where both the condemnor and condemnee agree, up to the time of the entry of judgment vesting plaintiff with title. And power is given to the court, where the parties agree, to vacate the judgment and thus revest title in the property owner * * *".

Rule 71A(i) which became effective August 1, 1951, contained therein the principles previously established by case law, namely that if the plaintiff had not acquired title or a lesser interest in the property, or had not taken possession, and if no hearing had begun to determine compensation, the plaintiff could dismiss as a matter of right [Rule 71A(i) (1)].

Before the entry of judgment vesting plaintiff with title or possession, the parties might stipulate to a dismissal in whole or in part without an order of court or on stipulation the court might vacate any judgment that had been entered. [Rule 71A(i) (2)].

Power was given the court before compensation had been determined and paid for property and after hearing and motion, to dismiss the action as to particular property, *except* it was not permitted to dismiss the action as to property of which the plaintiff had taken possession, or in which the plaintiff had taken title or a lesser interest. [Rule 71A(i) (3)].

The substance of these parts of the rule are in line with the prior case law, United States v. Sunset Cemetery Co., 7 Cir., 1942, 132 F.2d 163; United States v. Bauman, D.C.Or.1943, 56 F.Supp. 109; United States v. 16,572 Acres of Land, D.C.Tex.1942, 45 F.Supp. 23.

Thus, we conclude there is nothing in Rule 71A which prevents the government taking *more*, or a *greater estate* in property after an earlier taking. Rule 71A definitely puts limitations on attempts by the government to *decrease* or *limit* a taking, after title has vested or the government has gone into possession.

An analysis of defendants' cases squares with the above conclusion. United States v. Sunset Cemetery Co., 7 Cir., 1942, 132 F.2d 163 held that when the government by declaration of taking, had taken the fee simple subject only to highway easements, it therefore took an existing easement for drainage purposes, and after the vest--

ing of the title in the government, it could not divest itself of the drainage easement by amending the declaration of taking.

United States v. Bauman, D.C.Or. 1943, 56 F.Supp. 109, held that when the government in October 1942 sued to condemn a term for years running to June 1945, cancellable by election in June 1943 or June 1944, and took possession under court order, the government could not by a declaration of taking in September 1943, vary its taking by describing a term running to June 1944 with options to renew throughout the national emergency. The declaration of taking was stricken and a motion to file an amended complaint, describing the shorter term, was denied.

United States v. 16,572 Acres of Land, D.C.Tex.1942, 45 F.Supp. 23, held that where the government by declaration of taking had taken the fee simple, it could not amend the declaration of taking and the complaint to exempt oil and mineral rights from the taking.

We do not consider that Catlin v. United States, 1945, 324 U.S. 229, 65 S.Ct. 631, 89 L.Ed. 911, cited by defendants, or the same case in the Circuit, United States v. Catlin, 7 Cir., 1944, 142 F.2d 781, assists in any way.

None of these cases hold that once the government has taken a part of the fee, or a lease, it cannot take more.

On the other hand, in Simmonds v. United States, 9 Cir., 1952, 199 F.2d 305, the government having sued for a 15 year's easement was permitted to amend, to sue for the fee. In United States v. 6.74 Acres of Land in Dade County, Fla., 5 Cir., 1945, 148 F.2d 618, the government, owning and in possession of a negotiated lease, could nevertheless file a declaration of taking and take the fee. In United States v. Certain Parcels of Land in City of Baltimore, D.C.Md.1944, 55 F.Supp. 257, the fact that there was in existence, the Bethlehem lease, which the government had the right to take over as assignee, did not prevent the government from taking a term by condemnation, though it got no greater or other interest than it could have obtained under the terms of the lease.

(b) Merger and Effect Thereof.

Having concluded that the government took the third year term as an extended part of the term already taken, the question now arises as to what is the effect of the fee taking and whether the third year term must be valued separately, or as part of the fee.

The government urges that a merger occurred. There is no doubt as to the general rule of property law that when an estate for years and a greater estate vest in the same person without an intermediate estate being in existence, a merger occurs, Jameson v. Hayward, 1895, 106 Cal. 682, 39 P. 1078; Buell v. Simon Newman Co., 9 Cir., 1946, 154 F.2d 35, construing California law; and the same case below, Buell v. Simon Newman Co., D.C.No.Cal.1945, 61 F. Supp. 157. Equity, on a proper showing will prevent the merger, Jameson v. Hayward, supra.

The controlling consideration is the intention, expressed or implied, *of the person in whom the estates unite.* Ito v. Schiller, 1931, 213 Cal. 632, 635, 3 P.2d 1; Jansen v. Burton, 1931, 117 Cal.App. 66, 70, 3 P.2d 324; Jameson v. Hayward, supra, 106 Cal. 688–689, 39 P. 1079–1080.

In the Jameson case, the action was for partition between tenants in common of an estate for years and, in commenting upon the merger, the court says:

"In consonance with these principles, equity will prevent or permit a merger as will best subserve the purposes of justice and the actual and just intent of the parties (citing cases). In other words, equity is not guided by rules of law as to merger (citing cases). In the absence of an expression of intention, *if the interest of the person in whom the several estates have united,* as shown from all the circumstances, would be best subserved

by keeping them separate, the intent so to do will ordinarily be implied. Such is the rule enunciated in the cases cited supra." 106 Cal. at pages 688–689, 39 P. at page 1080.

In our case it was the obvious and declared intention of the government to take the fee as of June 16, 1955. Even if equitable considerations, running in favor of the landowners, could be considered, rather than the intention of the party in whom the estates unite, we see no such equitable considerations. We hereafter discuss valuation and show that the defendant landowners cannot be hurt.

■ Moreover, the government's right to secure complete and perfect title by fee taking under Sec. 258a should not, and cannot be limited or restricted. As the Fifth Circuit said in United States v. 6.74 Acres of Land in Dade County, Fla., 5 Cir., 1945, 148 F.2d 618, 620, "The holding of the court below that the Government * * * could not condemn more than the reversionary interest in Tract No. 2, proceeds upon the assumption that the Government would thus acquire a perfect title to the property from its lessor, and denies to the Government the right in condemnation cases to resort to a course which would establish in it an indefeasible title, good against the world. We find nothing in the Congressional Acts under which the Secretary of War proceeded that permits courts to inquire into and to thus limit the right of the Government in condemnation proceedings. * * * It does, however, make a difference to the Government, whether it obtains a fee title by operation of law or by eminent domain since under the latter course it acquires a title which is unassailable."

Simmonds v. United States, supra, and United States v. Certain Parcels of Land in City of Baltimore, supra, confirms our view that the government took the fee simple absolute on June 16, 1955 and the existing third year term merged therein.

(c) The Right to the Rent follows the Fee. After June 16, 1955, the government Would be Entitled to the Rent (the Fair Market Value) of the Third Year Term, if it existed Separately and did not Merge with the Fee.

■ Where a lease exists and the fee is sold, the parties may by agreement determine who takes the future rent payments. But in the absence of such agreement, the right to the rent follows the fee title.

Fahrenbaker v. E. Clemens Horst Co., 1930, 209 Cal. 7, 9, 284 P.905, holds:

" 'Rent is not, in common law regarded as accruing from day to day, as interest does, but it is only upon the day fixed for payment that any part of it becomes due. The result of this principle is that, ordinarily, the person who is on that day the owner of the reversion is entitled to the entire installment of rent due on that day, though he may have been the owner of the reversion or rent but a part of the time which has elapsed since the last rent day. * * * *When the landlord makes a conveyance of the reversion, the grantee is entitled, in the absence of a contrary stipulation, to all of the rent which* falls due at the next rent day.' Tiffany on Landlord and Tenant, § 176 * * * ". (Emphasis supplied.)

The case is significant because there was an involuntary transfer of the fee.

In accord with the above case, Kier Corp. v. Treasure Oil Company, 1943, 57 Cal.App.2d 829, 840, 136 P.2d 59; Ogden's California Real Property Law, 1956, Sec. 8.32, p. 337. See: Hindin v. Caine, 1951, 104 Cal.App.2d 238, 231 P. 2d 83; See In re Owl Drug Co., D.C.Nev. 1935, 12 F.Supp. 446; Teich v. Arms, 1907, 5 Cal.App. 475, 90 P. 962; Civil Code Sec. 1111.

Murphy v. Hopcroft, 1904, 142 Cal. 43, 75 P. 567, illustrates the reverse situation. Rents due before the passing

of the fee, cannot be recovered by the new fee owner.

We conclude that the rights to rents follow the fee in the absence of express agreement. In the case at bar there was no agreement since the title passed by operation of law. The defendant landowners, after June 16, 1955, would have had no rights to rents due July 1, 1955. They likewise have no right to the equivalent of rent, i. e. the fair market value of the third year term, due July 1, 1955, even if no merger occurred.

### (d) How Compensation shall be Determined for the Fee.

 It is obvious defendants are urging their contention that a third year term was taken and must be valued apart from the fee, because they *think* it will result in more money for the landowners—i. e. that the allowance for the third year term, plus the allowance for the fee as of June 16, 1955, less the existing third year term, will be a larger amount than if the fee simple was valued free and clear as of June 16, 1955.

But the decision of this court that the option is to be valued separately for its full effective term, whether exercised or not, has changed the whole picture on valuations of term and fee.

By our holding that the government took the fee simple absolute on June 16, 1955, and that a merger of the estates then occurred, the defendants cannot be hurt on the valuation of the fee simple absolute as of June 16, 1955. We pass for a moment the question of the remaining two weeks of the second year term.

We have held that the first and second year terms are to be valued at the same rental rate, that is the second year term, at $^{12}/_{44}$ths of the first year term and the option is to be valued separately. Because of this holding, if the third year term was to be valued separately, it would also be valued as of May 1, 1953 at the same rate as the first year term ($^{12}/_{44}$ths of the first year term).

If the third year term was valued separately as of July 1, 1955, it would undoubtedly be worth more than when valued as of May 1, 1953. Of course the compensation for the option right would make the owner whole.

The fallacy of the defendants' thinking, that they could secure more money by the valuation of the third year term separately, plus the valuation of the fee on June 16, 1955 less the value of the third year term, is now apparent. Under such a system they would receive a third year term valued as of May 1, 1953 but the jury would be instructed to deduct from the fee valuation on June 16, 1955, the value of a third year term valued as of July 1, 1955. Thus, the amount that would be deducted by the valuation of the third year term to diminish the fee, would be undoubtedly more than the defendants would receive for their separate valuation of the third year term as of May 1, 1953.

We think the mechanics of the matter will work out as follows: The fee taking eliminates all lesser titles and vests the entire title in the government. The jury will make an award of just compensation for the fee simple absolute and not for particular parts of the title. On distribution of the fund the former owners will be entitled thereto, less the rights of the lessees. The lessee will be entitled to the bonus value of his lease. If he has made a good bargain, the fair market of his lease may exceed rent money due, in which event he has money coming, but the rent money which will belong to the new fee owner, i. e. the government, must be offset against the potential claim of the lessee. Silberman v. United States, 1 Cir., 1942, 131 F.2d 715. The award to the lessee for the unexpired residue of his term "would be its present money worth over and above the obligations of the lease * * *", Carlock v. United States, 1931, 60 App.D.C. 314, 53 F.2d 926, 928.

This situation involving the fee taking must be distinguished from the situation involving the term taking. There the fee was still owned by defend-

ants and in the absence of termination clauses in the leases, the fee owners (lessors) were still entitled to the rent and the lessee to the value of their leases. In the fee taking situation the owners are no longer entitled to rent from their lessees.

### (e) The Remaining Two Weeks of the Second Year Term.

The problem presented by the remaining two weeks of the second year term is probably one of unjust enrichment. The government has taken a term, deposited estimated fair compensation and title has passed. The term ran to June 30, 1955.

The government took the fee simple absolute on June 16, 1955 and deposited estimated compensation for the value of the fee as of that date. There has been therefore a duplicate payment to the defendants in the nature of unjust enrichment and some stipulation or arrangement will have to be worked out to take care of this two week period.

### Date and Method of Valuation

### III. (Lease Order No. 2)

"The date and method of valuation shall be as follows:

"The just compensation for the taking of the leasehold estates described in the Declaration of Taking, filed April 29, 1953, shall be determined as of May 1, 1953, in accordance with the rules hereinafter announced.

"By ascertaining the fair market rental value of each of the parcels as of May 1, 1953, in the condition in which they were on May 1, 1953, burdened, restricted and encumbered as they were on that date, and enhanced, if they were enhanced, by any advantage accruing to or inherent in any or either or all of them, for the term commencing May 1, 1953 and ending June 30, 1954.

"The rate of rental for any extended term of the leasehold taken by the government shall be at the same rate per year, (i. e. $^{12}/_{14}$ths of the amount determined for the first fourteen month's period).

"The fair market rental value for the term commencing on May 1, 1953 and ending June 30, 1954, shall be payable in advance, as of May 1, 1953, and the fair market rental value for each extended term shall be payable in advance at the beginning of such extended term. Kimball Laundry Co. v. United States, 1949, 338 U.S. 1, 69 S.Ct. 1434, 93 L.Ed. 1765.

"Interest upon the deficiencies, if any, of said payments shall be payable from the due dates thereof until paid into the registry of the court. Kimball Laundry case, supra.

"The plaintiff's option right to renew the lease for yearly periods until June 30, 1958 and which option right is sought to be condemned herein is property for which the defendants are entitled to just compensation. Penilla v. Gerstenkorn, 1927, 86 Cal.App. 668, 261 P. 488; Standard Oil Co. v. Slye, 1913, 164 Cal. 435, 129 P. 589.

"Such option right for the full period taken shall be valued as of May 1, 1953, whether exercised or not. Such option right shall be valued separately from the fair market rental value of the term taken."

### III. (Fee Order No. 3)

"The date and method of valuation shall be as follows:

"The just compensation for the taking of the fee simple title described in the Declaration of Taking, filed June 16, 1955, shall be determined as of June 16, 1955, in accordance with the rules hereinafter announced.

"By ascertaining the fair market value of each of the parcels, together with any and all improvements thereon or used in connection therewith as of June 16, 1955, in the condition in which they were on May 1, 1953 (without reflecting in that value any enhancement, if there was any, resulting from the improvements made by the Government during its period of occupancy subsequent to May 1, 1953, and without reflecting any depreciation or wear and tear after May 1, 1953), burdened, restricted and en-

cumbered as they were on June 16, 1955, and enhanced, if they were enhanced, by any advantage accruing to or inherent in any or either or all of them on said date.

"The fair market value shall be payable as of June 16, 1955. Interest upon any deficiencies of deposit shall be payable from such due date until such deficiencies were or are paid. Interest shall not run after money is or has been deposited into Court, even though unallocated."

## Memorandum

### I.

### Unjust Enrichment

 The court rules that there may not be considered in the valuation of the property, improvements placed upon or betterments to the property by the government, insofar as they enhance the value of the property. The court believes the question is controlled by the authorities cited by the government, and particularly Searl v. School-District No. 2 of Lake County, 1890, 133 U.S. 553, 10 S.Ct. 374, 33 L.Ed. 740. The court is in accord with the dissenting opinion in United States v. Five Parcels of Land etc., 5 Cir., 1950, 180 F.2d 75.

 The government contends that the fee "evaluation must be made as of June 16, 1955 of the property *in the condition* in which it stood on May 1, 1953, without reflecting in that value, any enhancement, if there was any, resulting from the improvements made by the government during its period of occupancy under the term take".

In view of our holding, this is a position favorable to the landowners. Property is subject to reasonable wear and tear and depreciation. Between May 1, 1953 and June 16, 1955 the property undoubtedly would have shown the effects of the two years elapsed. Aside from appreciations in value from a rising market, the property was worth less on June 16, 1955 than on May 1, 1953. But the government is willing that the fee take be valued as of June 16, 1955, but with the property in the condition it was on May 1, 1953. Of course, the government having prevailed on its proposition of unjust enrichment, is not reluctant to leave this remaining crumb for the defendants.

### II.

### Interest On Unallocated Deposits

 The court rules that interest will not run upon monies paid into court even though unallocated among the defendants. The question is controlled by Title 40 U.S.C.A. Sec. 258a and the specific language, "but interest shall not be allowed on so much thereof as shall have been paid into the court." Atlantic Coast Line R. Co. v. United States, 5 Cir., 1943, 132 F.2d 959; United States v. 53¼ Acres of Land etc., 2 Cir., 1949, 176 F.2d 255; United States v. 53¼ Acres of Land, D.C.E.N.Y.1941, 40 F. Supp. 348; United States v. 44.00 Acres of Land etc., 2 Cir., 1956, 234 F.2d 410, 416; United States v. City of New York, 2 Cir., 1951, 186 F.2d 418; United States v. Miller, 317 U.S. 369, 63 S.Ct. 276, 87 L.Ed. 336; United States v. 0.45 Acres of Land in Town of Groton, 2 Cir., 1945, 151 F.2d 114. Though the moneys are unallocated, the court is open to hear applications and to make allotments thereof.

### Unit of Valuation
### IV. (Lease Order No. 2)

"The unit of value shall be determined as follows:

"Each parcel of property as separately designated in the Complaint, or as designated by amendment to the Complaint by stipulation or prior to trial, shall be a separate unit for valuation purposes.

"In connection with the valuation of said parcels the question of whether a witness can consider the reasonable probability of a particular parcel being combined or united in use, other than by the exercise of the power of eminent domain, in the reasonably near future with all or any of the other parcels involved in this litigation is preliminarily a question of law for the court to determine, at the time of trial, after the adducing

of all of the facts and evidence relevant thereto.

"If such evidence, together with all the inferences which can justifiably be drawn from it, shows there is a reasonable probability of such combination or unitization for a reasonable and probable use, then the Court will admit for the consideration of the jury such evidence together with evidence of value predicated thereon.

"In this connection, the burden of proof on the issue of the reasonable probability of such combination or unitization, is upon the defendant.

"In the event such evidence is submitted for the consideration of the jury, an appraiser in giving his opinion as to the value of such separately designated parcel shall be entitled to take into consideration such reasonable probability of the particular parcel being combined in the reasonably near future with all or any of the other parcels involved in this litigation, and the jury shall be permitted to consider such testimony and all other relevant evidence of such reasonable probability of unitization and of value predicated thereon.

"The appraisers shall be prepared to give evidence of value based on either of the alternatives which may occur at the trial, that is, evidence of value based upon the reasonable probability of a particular parcel being combined or united in use with all or any of the parcels involved in this litigation, as well as evidence of value excluding such probability." [2]

### Memorandum
### Unitization.

■ Proof of use of lands in combination with other lands is not excluded from a condemnation case, "if the possibility of such connection is reasonably sufficient to affect market value," McCandless v. United States, 1936, 298 U.S. 342, 56 S.Ct. 764, 765, 80 L.Ed. 1205, citing Olson v. United States, 1934, 292 U.S. 246, 54 S.Ct. 704, 78 L.Ed. 1236;

United States ex rel. TVA v. Powelson, 1942, 319 U.S. 266, 63 S.Ct. 1047, 87 L.Ed. 1390. Note that Powelson uses the words "reasonable probability" instead of "possibility."

■ This is part of the question of the highest and best use. "Value may be determined in light of the special or higher use of the land when combined with other parcels," Powelson, supra, 319 U.S. at page 275, 63 S.Ct. at page 1053.

■ It is elemental that the burden of proof of the highest and best use contended by defendant-landowners, as well as the burden of proof of fair market value is upon the defendant-landowners. Accordingly, if they contend for a use involving unitization or combination with other lands they have the burden of showing "the reasonable probability" of such use.

In determining the question of law as to whether a sufficient showing is made of the "reasonable probability," the court will want to hear *facts* and not some expert's ultimate opinion about the very problem the court is to decide. An expert, of course, may be used to present factual matters. Nor are we stating that expert testimony may not be offered on technical problems such as the adequacy of a sewer line. What we are stating is that we will not hear experts give their opinion that there is or is not the required "reasonable probability."

### Use of Sales and Leases occurring after dates of taking

### IV-A (Lease Order No. 2)

■ "Sales or leases of otherwise comparable property occurring subsequent to May 1, 1953, cannot, as a matter of law, be considered relied upon or testified to by any appraisal witness in arriving at or stating his opinion as to the fair market rental value for the leasehold taking for the reason that such sales or leases occurred after the filing

---

2. Paragraph IV of Fee Order No. 3 is similar.

of the plaintiff's Leasehold Declaration of Taking." [3]

■ Subsequent to the trial of this action, the Ninth Circuit has held that expert opinion on valuation, *may not be based, even in part, on events, facts or business development occurring after the date of valuation,* Standard Oil Co. v. Moore, 1958, 251 F.2d 189, 221.

### Participation at trial of subsequent Fee Purchasers

### V. (Lease Order No. 2)

■ "Purchasers of fee interests in the property condemned herein, subsequent to the date of the term taking, to-wit, The Salvation Army, a California Corporation, The Salvation Army, a New York corporation, and the Southern California Children's Aid Foundation, a California non-profit corporation, are not entitled, as a matter of right, to introduce independent evidence as to the fair market rental value of parcels 4 and 9-A, respectively, because said parties had no interest in said parcels as of the date of the filing of the original Declaration of Taking herein. However, the court may, in its sound discretion, permit said parties to introduce evidence as to the fair market rental value of said parcels as a whole." [4]

### Right of Lessees to present evidence of Value

### VI. (Lease Order No. 2)

■ "The right of lessees to present evidence of fair market rental value shall be as follows:

"A lease is property and any lessee of a portion of a parcel has the right to present relevant and non-cumulative evidence as to the fair market rental value of the entire parcel of property in which it has an interest if the fee owner thereof is not adequately and diligently presenting such evidence as to the fair mar-

ket rental value of said parcel as a whole.

"Under the facts of this case the lessee of an entire parcel has the right to present evidence as to the fair market rental value of said parcel as a whole." [5]

### Memorandum

In this case there exists no lessees who entered into lease *after* the taking of the leasehold term on May 1, 1953. There were various leases in existence at the beginning of the government term on May 1, 1953.

(a) Lyon Van & Storage lease on a portion of Building 1, in Parcel 4, dated June 7, 1948, and running to 1968.

(b) The Convair lease, on a portion of Building 1, in Parcel 4, was dated February 8, 1951, and expired by its terms March 31, 1954. It was subject to cancellation on March 31, 1954, by the giving of notice of election. Notice of election to cancel was given on May 19, 1953.

(c) John Hancock lease on a portion of Building 1, in Parcel 4. It was dated October 30, 1950, and expired November 30, 1953. There remained a portion in Building 1, in Parcel 4, which was unleased on May 1, 1953, of which Carlstrom was the fee owner.

(d) Dean, (dba National Van & Storage) lease, on all of Parcel 1. The lease was dated July 12, 1950 (term 1/1/51 to 12/31/60). Gregory Electric Company was the lessor. On August 19, 1953, Gregory served on Dean a notice to quit. State litigation is pending between Dean & Gregory Electric.

(e) Convair lease on a portion of Building 4, Parcel 5, dated February 6, 1951 and expired by its terms on March 31, 1954.

(f) Convair lease on a portion of Parcel 9-A, dated April 8, 1951, and expired according to its terms on September 30, 1954.

---

3. Paragraph IV–A of Fee Order No. 3 is similar.

4. There is no similar paragraph in "Fee Order No. 3" since there were not, and

could not be purchasers of the fee subsequent to the government's taking.

5. Paragraph V of Fee Order No. 3, is similar.

All parties agree that *if* the holder of a lease existing at the time of the taking on May 1, 1953, is entitled to put on evidence, *that evidence must go to the whole of the whole of the parcel taken* and not to the portion of the parcel covered by the lease.

If the owner of the fee is not adequately and diligently presenting evidence as to the fair market rental value of the parcel as a whole, then a lessee, on proper showing to the court, may be permitted to present any relevant and non-cumulative evidence as to the fair market rental value of the entire parcel. Silberman v. United States, 1 Cir., 1942, 131 F.2d 715.

 The government by its taking, takes the entire parcel and "wipes out all interests," Burkhart v. United States, 9 Cir., 1955, 227 F.2d 659, 661. "The compensation awarded is for the land itself and not for the sum of the different interests therein * * * The public pays what the land is worth, and lets the amount so paid be divided among the various claimants, according to the nature of their respective estates," 4 Nichols on Eminent Domain, Third Edition, Sec. 12.36(1).

 Where there are different estates in the property, the proper course is to ascertain compensation as though the property belonged to one person, and then apportion this sum among the different parties according to their respective rights, 2 Lewis on Eminent Domain, Third Edition, Sec. 716, page 1253; Carlock v. United States, 1931, 60 App.D.C. 314, 53 F.2d 926; Meadows v. United States, 4 Cir., 1944, 144 F.2d 751, at pages 752–753, 9 Cir., 1955, 227 F.2d 659–661; United States v. 25.936 Acres of Land etc., 3 Cir., 1946, 153 F.2d 277, 279.

In our case, the Dean lease covers all of Parcel 1. The lease is in litigation in the state court. We discuss elsewhere the rules of comity and res judicata, which would bear on our attitude towards a final state judgment.

If the Dean lease—(d) above—was not terminated between lessor and lessee, by the taking, then Dean would owe his rent, and he would be entitled to the whole award from the term taking. This compels us to decide that under the facts of the case, Dean would have a right to present evidence of the fair market rental value of Parcel 1.

As to the Lyon, Hancock and Convair leases (a), (b), (c), (e) and (f) above, we do not think the lessees have a similar right, except where the fee owner is not adequately or diligently making his presentation.

We may as a matter of grace permit the testimony. This will depend on further pretrial developments; for example, the submission in camera to the court of the values to be placed on the parcels by the fee owner and the lessees.

The court proposes to make an order requiring all parties to submit *in camera* to the court for its inspection only, the values proposed to be placed on the various parcels. This will assist in determining whether other lessees should be permitted to put on evidence. Valuation to be proposed will not be the only criterion. If the fee owner fails to fairly and diligently present the case, there would be a right in the lessee under the cases, to put on evidence.

### Lessees Removal and Relocation Costs

#### VII. (Lease Order No. 2)

 "A lessee whose term was exhausted by the leasehold taking or by the fee taking has no right to recover for removal or relocation costs." [6]

### Memorandum

The government's first term commenced May 1, 1953, and ran to June 30, 1954. It was renewed from July 1, 1954 to July 1, 1955. On June 16, 1955 the government took the fee. Though the original term taking, with right to renewal until June 30, 1958, would not have exhausted some of the leases, the situation changed with the taking of the fee.

---

**6.** Paragraph VI of Fee Order No. 3 is similar.

The problem is controlled by United States v. General Motors Corp., 1945, 323 U.S. 373, 65 S.Ct. 357, 89 L.Ed. 311; United States v. Petty Motor Co., 1946, 327 U.S. 372, 66 S.Ct. 596, 90 L.Ed. 729; and United States v. Westinghouse Elec. & Mfg. Co., 1950, 339 U.S. 261, 70 S.Ct. 644, 94 L.Ed. 816.

We now know "whether the tenant will have to move back into the leased premises," United States v. Westinghouse Elec. & Mfg. Co., supra, 339 U.S. at page 267, 70 S.Ct. at page 647. In fact, we know that the tenants will not. The term takings and the fee taking are all part of this case. Accordingly, the removal costs are not allowable.

## Rights of Lessees to recover
## Going concern value, and goodwill

### VIII. (Lease Order No. 2)

■ "A lessee whose business has not been condemned by the government has no right to recover for the loss of "going concern" value, goodwill or business." [7]

### Memorandum

When the government has condemned and taken the *business* of an owner, it must pay just compensation therefor. In Kimball Laundry Co. v. United States, 1949, 338 U.S. 1, 69 S.Ct. 1434, 93 L.Ed. 1765, the government took a laundry for a term and *operated* it. It was required to pay for the temporary use of the trade routes.

But when the *fee* to business property is taken, there is no obligation to pay for going business value. "In the usual case most of it can be transferred; in the remainder the amount of loss is so speculative that proof of it may justifiably be excluded," Kimball Laundry Co., supra, 338 U.S. at page 12, 69 S.Ct. at page 1441.

The federal constitution requires just compensation to be paid only for property "taken." Some state constitutions provide for compensation for property "taken or damaged."

Since here the fee and not the business has been taken, no recovery may be had for "going business value."

## Termination of Leases

### IX. (Lease Order No. 2)

"The court will examine the lease contract between a lessor and lessee, and will determine whether the lease contract contains an express condemnation clause (i. e. a clause providing for termination of the lease in the event of condemnation) or whether the parties have by some other provision of the lease contract covered the problem of the effect upon the rights of lessor and lessee of the institution of a condemnation proceeding.

"In the absence of an appropriate condemnation clause in any lease, a lease as between lessor and lessee was not terminated, nor was the obligation of the lessee to pay rent terminated, solely by the filing of this action or the original or subsequent declaration of taking herein." [8]

### Memorandum
### (a) Express Condemnation clause in the lease

■ If a lease has an express provision that in the event of condemnation the lessee may have no part of the award, then the parties to the lease have fixed their rights by contract and the lessee takes nothing. See the cases cited in United States v. Petty Motor Co., 1946, 327 U.S. 372, at page 376, note 5, 66 S.Ct. 596, 90 L.Ed. 729. None of the leases here have such an express provision. If the above example is called the black cat, then all of our cats are gray. We will look first to the contract provisions the parties have made between themselves.

### (b) If no lease Provision Terminates the Lease

■ What is "property" for which compensation must be paid upon its taking, is governed by the law of the

---

7. Paragraph VII of Fee Order No. 3 is similar.

8. Paragraph VIII of Fee Order No. 3 is similar.

state in which the property is located. However, the quantum and method of proving just compensation is a federal question and is governed entirely by federal law.

Gawzner v. Lebenbaum, 9 Cir., 1950, 180 F.2d 610, and United States v. Adamant Co., 9 Cir., 1952, 197 F.2d 1, correctly stated the law applicable on apportionment. The Gawzner case, supra, looked to California law as to the character of property in oil leases.

■■■ All parties apparently concede the California rule to be that condemnation in and of itself does not terminate the lease, and that the lessee is entitled to his proportionate share of the award. City of Pasadena v. Porter, 1927, 201 Cal. 381, 257 P. 526, 53 A.L.R. 679; City of Los Angeles v. Hughes, 1927, 202 Cal. 731, 262 P. 737; People v. Ganahl Lumber Co., 1938, 10 Cal.2d 501, 75 P.2d 1067. See, Giraud v. Milovich, 1938, 29 Cal.App.2d 543, 549, 85 P.2d 182.

Convair ceased to pay rent on two leases where the lease term was to expire within the first term of the government's taking, that is, within the first 14 months. It continued to pay rent on a lease which extended to September 30, 1954. However, when the government on May 19, 1954, exercised its option and renewed the term taking for another year, viz., June 30, 1954, to July 1, 1955, Convair likewise ceased paying on this lease.

Convair's position, expressed in court and in statements of its position filed herein, is that its obligation to pay rent was suspended.

We conclude with a few remarks directed to the logic of the situation.

■■■■ (1) The lessor and lessee, having made a contract as to the amount of rent, this court cannot remake it or readjust the rent. City of Pasadena v. Porter, supra, 201 Cal. 388, 257 P. 529.

(2) Ordinarily, the lessee should have the benefit of his bargain. If he has agreed to pay $100 per month, and the

fair market rental value at the date of taking is $200, he should have the excess or bonus value.

(3) Since the amount fixed by the jury is for the value of the term taken, this amount represents the whole value of all interests involved.

(4) If the lessor has fixed the value of that term or a portion thereof by lease, this ordinarily would represent the amount later apportioned to him. The lessee would receive the excess, if any.

(5) This court under 40 U.S.C.A. § 258a, must equitably apportion the fund. It may, therefore, out of the total allocated to a certain parcel, provide that past due rent moneys under leases, be paid to lessors.

■■■ Finally, in United States v. Petty Motor Co., supra, which involved only the rights of lessees, the court said:

"The measure of damages * * * is the value of the use and occupancy of the leasehold for the remainder of the tenant's term, plus the value of the right to renew in the lease of Petty, less the agreed rent which the tenant would pay for such use and occupancy." 327 U.S. at page 381, 66 S.Ct. at page 601.

Proper Forum for determining
Lease Disputes

X. (Lease Order No. 2)

"With respect to the question as to the proper forum for determining disputes between lessors and lessees as to any leases having been terminated for reasons other than an appropriate condemnation clause and the taking herein, the Court rules as follows:

"This Court is the proper forum and has jurisdiction to judicially determine disputes concerning the existence of, cancellation of, or other matters relating to leases, insofar as the distribution of money which has been deposited or will be deposited in connection with this proceeding.

"This Court has jurisdiction to allocate the award between the lessors and lessees in accordance with the facts presented, including but not limited to a consideration of the fact as to whether or not such lessees continued to pay rent after the date of the original taking herein.

"In connection with any pending action in the Superior Court of the State of California relating to litigation of disputes between lessors and lessees concerning the existence, non-existence, cancellation, termination of, or other matters relating to leases on real property within the State of California, this Court, while adhering to the principles of comity, res judicata, and estoppel by judgment, specifically reserves the right to judicially determine, at the time of trial or the time of the apportionment of the award, whether or not it will be bound by any final decisions of said Superior Court." [9]

## Memorandum

■ There is no doubt of this court's jurisdiction, Gawzner v. Lebenbaum, 9 Cir., 1950, 180 F.2d 610; Galvin v. Southern Hotel Corporation, 4 Cir., 1947, 164 F.2d 791; Oliver v. United States, 8 Cir., 1946, 156 F.2d 281.

■ "The condemnation award when made stands in the place of the land and the rights of all persons may be treated as though transferred to the award." United States v. 25.936 Acres of Land, etc., 3 Cir., 1946, 153 F.2d 277, 279.

The division of the award does not concern the government and is usually treated, "as one of interpleader * * * and [the tenants] come in as claimants." Burkhart v. United States, supra, 227 F.2d at page 662.

■ Where State proceedings have proceeded to final judgment, the doctrine of res judicata applies. Or more accurately, the doctrine of estoppel by judgment, United States v. Adamant Company, 9 Cir., 1952, 197 F.2d 1, at pages 9 and 12. The inquiry then is, (1) are the same parties involved, and (2) was the issue litigated? Partmar Corporation v. Paramount Pictures Theatres Corporation, 1954, 347 U.S. 89, 91, 74 S.Ct. 414, 415, 98 L.Ed. 532. This case points out that, "a judgment entered in an action conclusively settles that action as to all matters that were or might have been litigated or adjudged therein. But a prior judgment between the parties has been held to operate as an estoppel in a suit on a cause of action different from that forming the basis for the original suit 'only as to those matters in issue or points controverted, upon the determination of which the finding or verdict was rendered.' This latter aspect of res judicata is the doctrine of collateral estoppel by judgment."

There must be a final judgment for the rule to apply.

■ When the action in the State court has not proceeded to final judgment and is still pending, res judicata or estoppel by judgment does not apply. Whether or not the Federal court should proceed to hear or decide the matter brings into play the principle of comity, United States v. Adamant, supra. Federal courts are extremely reluctant to interfere with actions pending in the State courts. There would be preliminary inquiry before applying the principle of comity. The inquiry would concern (1) are the parties and the issues the same, so that the state judgment when entered, will be binding? (2) Is the state action being diligently pressed? (3) When can the state judgment be rendered and when can it become final?

If there existed no final State judgment, the court would make inquiry on these matters above indicated before it decided whether to exercise the jurisdiction of this forum or await a decision by the State court.

9. Paragraph IX of Fee Order No. 3 is similar.

### Reduction of Award or Abatement As To Parties Remaining In Possession

#### XI. (Lease Order No. 2)

 "Any rental compensation found to be payable by the Government in these proceedings shall be subject to abatement as to those parties who remained in possession after the taking by the Government, except, however, as to those parties placed in possession by the Government after the taking.

"The foregoing matter does not require a decision by the Court prior to the verdict for fair market rental value, and it is not a question which should be submitted to the jury which determines such issue.

"Said question is to be determined by the Court after the fair market rental value is determined, and in making such determination the Court will hear additional evidence if necessary as to the time and quality of possession of the lessees after the taking, as well as any other relevant evidence necessary to a proper determination of the question." [10]

#### Memorandum

After the government's term began on May 1, 1953, certain lessees remained in possession for various periods. The government moved for an order of immediate possession and it was postponed or temporarily denied. The government and the parties defendant are in agreement that this matter may go over to the subsequent phase of the case concerning apportionment.

The second draft of the proposed pretrial order leaves open, "whether rental compensation found to be payable by the government in these proceedings should be reduced as to those parties who remained in possession after the taking by the government."

The defendants may not blow hot and cold. They will offer evidence of the fair market rental value of the parcels, and the jury will make such determination. The premises occupied by them may be less than the area of the parcel. However, the jury verdict will go far in assisting the court to determine the proper apportionment. It might be only common fairness to charge against the lessee the same fair market rental value that he contended for at the trial.

Thus, if a lessee pays $100 per month, and it is determined either by jury verdict for the particular parcel or by court apportionment for less than the parcel, that the fair market rental value is $200 per month, then there should be charged against that lessee $200 per month for the period he remained in possession, and his award reduced by this amount.

The court will here, likewise, require statements in camera before trial as to what value is contended for by the various parties.

To this probably should be added that the court will consider also, the factual question of just what type or quality of possession the tenant had. Was it an orderly or disrupted possession?

### Value of Parking Rights—Were parcels Beneficial or Burdened?

#### XII. (Lease Order No. 2)

 "With respect to the question as to the valuation of the parking rights in Parcel 10-A, the Court rules as follows:

"A witness in testifying as to an opinion of fair market rental value as to any particular parcel of property sought to be condemned, other than Parcel 10-A, shall have the right to take into consideration as one of the elements upon which he bases his opinion the fact that employees of any business conducting its operation on any portion or part of such parcel have the right to park on said Parcel 10-A in accordance with the terms of that certain agreement dated March 17, 1947, by and between the Reconstruction Finance Corporation and the San Diego Baseball Club.

10. There is no similar paragraph in Fee Order No. 3. The problem did not arise on the fee take.

"The fair market rental value payable for the taking of said Parcel 10-A shall be determined subject to such parking rights." [11]

## No Right to Jury Trial on Apportionment

### XIII. (Lease Order No. 2)

■ "There is no right to trial by jury on the matter of apportionment of the award between lessor and lessee or the owners and holders of any other interest which may be entitled to share in the award.

"After the jury has determined the issue of fair market rental value, the Court in the second phase of the proceedings relating to the apportionment thereof, will determine such question of apportionment without the aid or use of a jury." [12]

### Memorandum

We start with the notes of the Advisory Committee on Rules for Civil Procedure. We have inspected the various drafts and the notes contained therein.

■ "There is no constitutional right to a jury trial in a condemnation proceeding. Bauman v. Ross, 1897, 167 U.S. 548, 17 S.Ct. 966, 42 L.Ed. 270. See, also, Hines. Does the Seventh Amendment to the Constitution of the United States require Jury Trials in all Condemnation Proceedings? [1925] 11 Va.L.Rev. 505; Blair, Federal Condemnation Proceedings and the Seventh Amendment [1927] 41 Harv.L.Rev. 29; 3 Moore's Federal Practice [1938] 3007. Prior to Rule 71A, jury trial in federal condemnation proceedings was, however, enjoyed under the general conformity statute, 40 U.S.C. Sec. 258, in states which provided for jury trial. See generally, 2 Lewis, Eminent Domain (3rd Ed. 1909) Sections 509, 510; 3 Moore, op. cit. supra."

The Committee's study developed that Congress had provided a tribunal for the trial of the issue of just compensation in two instances: (1) condemnation under the Tennessee Valley Authority Act, 16 U.S.C.A. § 831 et seq., and (2) condemnation in the District of Columbia. The Committee proposed to make provision for any other special tribunals that might be created by Act of Congress.

Accordingly, Rule 71A(h) as adopted provided:

"Trial. If the action involves the exercise of the power of eminent domain under the law of the United States, any tribunal specially constituted by an Act of Congress governing the case for the trial of the issue of just compensation shall be the tribunal for the determination of that issue; but if there is no such specially constituted tribunal any party may have a trial by *jury of the issue of just compensation* by filing a demand * * * unless the court in its discretion orders that, because * * * the issue of compensation shall be determined by a commission of three persons appointed by it. * * * *Trial of all issues shall otherwise be by the court.*" (Emphasis added.)

The government urges that there is no right to jury trial on the apportionment phase and the defendants who have filed a brief state, "These defendants respectfully submit that the only right to a trial by jury as guaranteed by Rule 71A is in the first phase of the condemnation proceeding, whereby the property is evaluated as a whole."

The concession must be made. In addition to the authorities cited to the effect that there is no constitutional right to a jury trial even on the basic and primary issue of compensation, there should be added the following: Dohany v. Rogers, 1930, 281 U.S. 362, 50 S.Ct. 299, 74 L.Ed. 904; Long Island Water-Supply Company v. City of Brooklyn, 1897, 166 U.S. 685, 17 S.Ct. 718, 41 L.Ed. 1165; Shoemaker v. United States, 1893,

11. Paragraph X of Fee Order No. 3 is similar.

12. Paragraph XI of Fee Order No. 3 is similar.

147 U.S. 282, 13 S.Ct. 361, 37 L.Ed. 170; United States v. Jones, 1883, 109 U.S. 513, 3 S.Ct. 346, 27 L.Ed. 1015; Kohl, etc. v. United States, 1875, 91 U.S. 367, 23 L.Ed. 449; United States v. 243.22 Acres of Land in the Town of Babylon, 2 Cir., 1942, 129 F.2d 678; Nichols on Eminent Domain, Third Edition, Vol. 1, Sec. 4.105(2). See also (idem) Vol. 2, Sec. 5.3(4), on the apportionment of the award and the fact that the condemnor is not concerned therein.

No cases have been found directly in point since the adoption of Rule 71A. Burkhart v. United States, 9 Cir., 1955, 227 F.2d 659, is persuasive. The court states, as to the matter of apportionment, "The courts treat the proceeding for the division of the proceeds as one of interpleader * * *" at page 662.

United States v. Adamant, 9 Cir., 1952, 197 F.2d 1, is also persuasive. The primary issue of compensation was tried by a jury. On appeal on the issue of apportionment, which was tried by the court, the Circuit stayed the execution of the District Court's apportionment until the final decree in an accounting suit. The case was tried before the adoption of Rule 71A, but the opinion of the Circuit was rendered after the rule became effective.

### Order of Proof at Trial

#### XII. (Fee Order No. 3)

"The Court rules that pursuant to the Order heretofore made and upon further consideration the order of proof on the trial will be as follows:

"*First:* Testimony will be taken on the part of defendants and then on the part of plaintiff on the question of the condition of the property as of May 1, 1953.

"*Second:* Testimony will be taken on the part of defendants and then on the part of plaintiff on the issue of compensation for the *leasehold* taking.

"*Third:* Testimony will be taken on the part of defendants and then on the part of plaintiff on the issue of compensation for the *fee taking.*" [13]

### Memorandum
### Separate Trials

▆ The motion of certain defendants for a separate jury trial on the term and fee takings is denied.

The alternative motion for a trial and verdict by one jury on the term taking, and then a trial and verdict by the same jury on the fee taking is denied.

The court will consider further the other alternate motion concerning order of proof, viz, all proof to be first heard as to the term taking and then all proof to be heard as to the fee taking. The only objection the court sees to this proposal is the convenience of the appraisers.

### Pretrial Order No. 4
### (10/18/56)

The court, having heretofore advised counsel in general terms of its proposed order, now makes the following pretrial order:

(1) On or before 11/27/56 counsel will exhibit to each other and prepare a written stipulation containing a schedule of Exhibits of all maps, written documents and exhibits any party proposes to offer in evidence. The stipulation will waive foundation and all objections to the proposed exhibits, unless such objections are expressly reserved in the stipulation;

(2) On or before 11/20/56, the plaintiff and each defendant proposing to offer evidence as to value will,

(a) Exchange list of comparable sales and leases

(b) Agree to separate or joint written summations of data on such comparable sales and leases, showing names, area, description, date of transactions, recording reference, improvements, price, amount of internal revenue stamps, and other matters about which there should be no dispute.

13. Not in Lease Order #2. Applies to both Lease and Fee phases of the case.

The court tentatively proposes to receive such lists in evidence, either (1), after the expert has testified about the sales and leases, as a summary of the testimony of the witness or witnesses and not as direct evidence of the matters contained in the exhibits, or (2) by stipulation of the parties without the necessity of oral testimony.

Badger Coal Co. v. Quemahoning Coal Co., 3 Cir., 1926, 14 F.2d 743, 746–747; Wilkes v. United States, 9 Cir., 1935, 80 F.2d 285, 291; Shreve v. United States, 9 Cir., 1939, 103 F.2d 796, 811; Augustine v. Bowles, 9 Cir., 1945, 149 F.2d 93, 97; San Pedro Lumber Co. v. Reynolds, 1898, 121 Cal. 74, 76, 53 P. 410.

(c) File with the court and serve on opposing counsel a document listing the names and addresses of their expert witnesses and the general character of their testimony as to subject matter, i. e. expert on industrial equipment, or land value or building depreciation, etc.

(d) File with the court and serve on opposing counsel a statement of the highest and best use or uses of the property, which each expert will state in his testimony,

(3) On or before 11/27/56 each party will submit to the court *in camera* for its private inspection, a statement of the total valuation each expert will place upon each parcel of the property in suit. If there are alternate theories available under the pretrial rules, then such alternate values shall be included.

### Miscellaneous Pretrial Rulings
(Not included in Pretrial Order No. 1 to 4)

### Oral Grants

█ Various of the defendant land owners contended that in the transfers of portions of the fee following the original term taking, and prior to the fee taking on June 16, 1955, that mutual mistakes had been made in the conveyancing by which alleged easements of ingress and egress allegedly agreed upon between the fee owners, had been omitted from the conveyancing, and that in addition oral grants of various types of easements had been made by various fee owners.

In order to raise the issue for pretrial hearings, the defendant land owners involved entered into a stipulation between themselves setting forth the alleged mutual mistakes and setting forth the alleged oral grants. Upon the filing of the stipulation, the government moved to strike it from the files. The court denied the motion on the following grounds.

### Minute Order re Pretrial Ruling on Oral Grants
(7/20/56)

1. The motion of the government to disprove or strike from the files the stipulation of certain defendants for pretrial ruling on oral grants is denied;

2. The court treats the stipulation as a showing of what proof the defendants propose to make at the trial; said stipulation to be used by the court only for the purpose of pretrial ruling;

3. The stipulation will not be binding on the government at the time of trial;

4. The court holds that proof of oral grants and mutual mistake made between certain of the defendant land owners prior to the date of taking of the leasehold, will be received in evidence;

█ 5. That the court will rule that testimony of the declaration of an owner after the time he has parted with title, will not be received in evidence but testimony of his declaration while he had title will be received in evidence. The testimony of a witness in the courtroom is not a declaration within this rule.

### Motion for Continuance during Pending of Appeal on Tax Question

During the pretrial proceedings, the court ordered cancellation of city and county taxes against the property. The government had taken the fee on June 16, 1955, and the taxes were for the fiscal year commencing July 1, 1955 and running to June 30, 1956. Under California

486

tax laws they had become a lien on the property on the first Monday in March of 1955, prior to the government taking. The judgment entered was appealed from and prior to the filing of this opinion the judgment was affirmed, County of San Diego v. United States of America, 9 Cir., 251 F.2d 534.

Prior to trial, on or about October 15, 1956, various of the defendants brought on for hearing a motion for continuance of the trial on the merits of the condemnation case then scheduled for December 1956, upon the ground that the case should not be tried until the Circuit decided the appeal concerning taxes. The position of the defendants on the motion was that regardless of the decision of the Circuit, it would have an impact on the trial of the case, and that the ruling of the Circuit was necessary before the trial could proceed; that if the Circuit held that the taxes were a lien on the property, then the property would be valued by their appraisers as being worth that much more. If on the other hand, the Circuit sustained the court, then the property would be valued free and clear of taxes.

The court denied the motion for a continuance and rendered the following oral opinion, setting forth the reasons for the court's ruling.

### Decision on Motion for Continuance (10/15/56)

██ A condemnation proceeding is in rem. United States v. 25.936 Acres of Land, etc., 3 Cir., 1946, 153 F.2d 277, 279. The land is condemned and valued. In a subsequent phase of the case, the court apportions the money, awarded as just compensation, among the claimants.

"Upon the filing said declaration of taking and of the deposit in the court * * * of the amount of the estimated compensation * * * title to the said lands in fee simple absolute, or such less estate or interest therein as is specified in said declaration, shall vest in the United States of America * * *", Sec. 258a, Title 40 U.S.C.A.

██ Under California law, the taxes of the City and County of San Diego for the fiscal year 7/1/55 to 6/30/56 became a lien the first Monday in March 1955. The taking of the fee occurred on June 16, 1955.

If the judgment of this court is reversed and the taxes for 1955 and 1956 have to be paid, we see no reason or logic that such a situation would decrease or increase the value of the leasehold or the fee which the United States condemned.

Assume for argument, the Circuit reverses the case as to just compensation has been tried and the amount thereof fixed by the jury:

"The taxes were a lien on the land at the time of the verdict, and the verdict fixed the value of the land regardless of liens. The verdict in no sense included any readjustment of the liens. That was a matter for the court when the fund in its hands was distributed. It could not be contended that a mortgage given by the owner of land sought to be condemned was in any way included or settled by the verdict of a jury fixing the value of the land. The tax lien was at least of equal dignity as a mortgage lien and was in no way affected by the verdict," South Carolina Public Service Authority v. 11,754.8 Acres of Land, etc., 4 Cir., 1941, 123 F.2d 738, at page 741.

Or suppose there was a questionable judgment lien against the property which the court had, prior to trial, ruled was invalid. Regardless of the outcome of an appeal, the judgment lien would not properly be for the consideration of the jury in fixing just compensation. The government is condemning the fee, not the separate estates in the property. United States v. 25.936 Acres, supra, 153 F.2d at page 279. In such a case if the judgment was affirmed holding the judgment lien bad, then the fee owner on apportionment, would get the whole fund. If the judgment was reversed, the fee owner on apportionment, would

receive the award, less the amount due on the judgment lien.

The cases cited by defendants are not in point. United States v. Certain Parcels of Land, etc., D.C.Md.1945, 61 F. Supp. 164, arose on the apportionment phase of the case. The "fund in court in condemnation cases * * * represents the value of the whole property free of liens," at page 168. The effect of the dictum quoted by defendants from page 169, as to a special instruction to the jury "with respect to the valuation as affected by the tax claim" is not clear. It probably refers to a Maryland statute on apportionment. The case cited in support, South Carolina Public Service Authority v. 11,754.8 Acres, supra, assists in that there the South Carolina statute on apportionment is referred to. The case refers to the contention "that the question of payment of the taxes was never brought to the attention of the jury and that if it had been the award of the jury would have been larger." The court said, "We do not agree with the contention," and "The defendants * * * could have had this question brought to the jury's attention * * *" by instruction on that point. 123 F.2d at page 741. The case does not assist defendants.

United States v. 5.741 Acres of Land etc., D.C.E.N.Y.1943, 51 F.Supp. 147, 149 was undoubtedly an oral opinion rendered from the bench. No authority is cited for the proposition that the "taxes, water, and insurance are proper subjects for consideration." However, immediately following the reference to insurance and taxes, the court fixed a rental value, based on a *net return* to the defendant. The court was obviously considering taxes only to determine a *net* return to the land owner, as rental value.

United States v. 68,716 Sq. Feet of Land etc., D.C.So.N.Y.1948, 79 F.Supp. 438, 441, reversed on other grounds 2 Cir., 1949, 175 F.2d 75, at best must be limited to its facts. The portion quoted by defendants is, "The United States is * * * bound to compensate the Lebanon Hospital Association for the *use and occupancy* * * * which * * * led to its restoration to the tax rolls. Therefore * * * the *United States must compensate for the increased tax burden,* provided it is properly laid." (Emphasis supplied.) There is not a similar factual situation in our problem.

In support of the court's view herein is United States v. 412.715 Acres of Land etc., D.C.N.D.Cal.1945, 60 F.Supp. 576, 577, where Judge St. Sure stated, as to Sec. 258a, 40 U.S.C.A., "The provision has not been interpreted as permitting the court to order that a fund representing just compensation be increased by the amount of the tax liens on the lands prior to the passage of the title, or that the land be taken subject to such liens, and I can find no authority for such procedure."

United States v. 25.936 Acres of Land etc., 3 Cir., 1946, 153 F.2d 277, is an excellent case on the subject. " * * * The amount of compensation to be paid must be determined as if the property was in a single ownership and without reference to conflicting claims or liens. * * * Taxes levied and assessed against real estate do not increase the land's value * * * Valid tax liens must be satisfied from the award." At page 279.

Nor should the question of whether or not there were valid tax liens to be paid from the fund on apportionment, affect the fair market value of the property. It has been *decided,* adversely to defendants' contentions, that valuation for tax purposes is not a proper consideration in fixing just compensation, Johnson & Winsatt v. Reichelberger, Inc., D.C.Cir., 1931, 50 F.2d 336, 337; United States v. Delano Park Homes, 2 Cir., 1944, 146 F.2d 473, 474; Murdock v. United States, 8 Cir., 1947, 160 F.2d 358, 362.

The motion for a continuance is denied.

### Reproduction Cost New Less Depreciation
### (During trial 2/7/57)

One of the few major legal problems on which the court did not rule prior to trial, was that of the admissibility of evidence offered by defendants on, (1) the "cost of reproduction of the buildings new" as of the dates of taking, and (2) the "original cost of the buildings less depreciation" to the dates of taking. This evidence was offered in both the term and the fee phases of the case.

The government objected on the grounds, (1) that costs as such are never proof of value, (2) that fair market value may be many times the cost or it may be only a fractional portion of the costs, (3) that the Supreme Court has never held that such evidence was admissible, even when there was an absence of a market and a so-called secondary evidence was offered.

The defendants originally offered such evidence as to the *fee* on two grounds, (1) as a factor to be considered by the appraiser, and (2) as direct evidence of value. They disclaimed however, any intention to offer evidence of the value of the land alone. The court pointed out that evidence of the cost of the buildings as direct evidence of value, ran afoul of the rule that each parcel of the property must be valued as a whole and not in segments; and second, such evidence of reproduction cost of improvements would be meaningless without separate evidence of the land value, standing alone, without improvements.

Counsel for defendants argued that whether or not their experts were allowed to consider "cost new less depreciation" as a factor, the ultimate opinion of their experts as to fair market value would not be changed—i. e. that their figure on fair market value would be the same whether or not they considered this factor.

The court instructed counsel for defendants to interview their experts and submit in camera to the court,

1. The figures to be testified to by the experts for defendants on "reproduction costs new less depreciation."

2. The valuation figure of each expert, if the expert was to be allowed to consider the factor of "reproduction cost new less depreciation" but was not permitted to state it to the jury.

3. The valuation figure of each expert, if the expert was not to be permitted to consider "reproduction cost new less depreciation" as a factor.

Thereafter, counsel for defendants informed the court that their appraisers would not be able to formulate and testify to an opinion of fair market value, if they were not permitted to use and consider in forming their opinions, the factor of "reproduction cost new less depreciation." Offers of proof in both the term and fee phase of the case, were made by defendants and objections thereto sustained by the court.

### Oral Opinion

We are prepared to make final rulings on the problem of "reproduction costs," both leasehold and fee. We sustain the objection to the introduction in evidence of expert testimony of dollars and cents value as to "reproduction costs," "reproduction costs less depreciation," or "reproduction costs new, less depreciation," whatever way it might be offered.

*First.* We are convinced that the measure of value in a condemnation case in the Federal court is fair market value and that reproduction cost is remote from, and has little bearing on fair market value.

The Supreme Court recently said in United States v. Toronto, Hamilton & Buffalo Nav. Co., 1949, 338 U.S. 396, at page 403, 70 S.Ct. 217, at page 221, 97 L.Ed. 195:

" * * * But there are few of these substitute standards which are in fact of assistance in assessing the value of the Maitland. Original cost is well termed the 'false stand-

ard of the past' where, as here, present market value in no way reflects that cost. So with reproduction cost, when no one would think of reproducing the property * * *".

*Second.* The introduction of expert testimony on reproduction costs or reproduction costs less depreciation separately values buildings from land. We are in disagreement with the cases from the Eighth and Fourth Circuits, which permit minerals, timber, buildings, etc., to be valued separately from the land, Clark v. United States, 8 Cir., 1946, 155 F.2d 157, 160; Cade v. United States, 4 Cir., 1954, 213 F.2d 138, 141; United States v. 5139.5 Acres etc., 4 Cir., 1952, 200 F.2d 659, 661. And in disagreement with National Brick Co. v. United States, 1942, 76 U.S.App.D.C. 329, 131 F.2d 30, if it be so interpreted.

The better rule, to the contrary, is found in the Fifth, Sixth and Seventh Circuits, Georgia Kaolin Co. v. United States, 5 Cir., 1954, 214 F.2d 284, 286; United States v. Meyer, 7 Cir., 1940, 113 F.2d 387; Morton Butler Timber Co. v. United States, 6 Cir., 1937, 91 F.2d 884, 887–888. You cannot separately value land and buildings for appraisal purposes in a condemnation suit. That is, in substance, what defendants propose to do. Nor have they offered to prove the separate value of the land. How in logic, can they propose to do one and not the other.

*Third.* No matter how carefully a judge attempts to instruct a jury that certain evidence is only background material or not direct evidence of value, there is no assurance that he can, in a complicated case, put that over to a jury; and the impact of direct testimony of dollars and cents of "reproduction cost less depreciation," will tend to mislead a jury in fixing, as they should, what the willing buyer and willing seller would arrive at in the market place, and would divert them from their consideration of comparable sales as to the best evidence of value and from properly con-

sidering all the factors that an expert would consider, i. e. whether the comparable sales, were sufficiently close in time, size, description; and the various other factors underlying the expert's opinion.

On the other hand, we are going to permit the experts for the defendants to state, in general terms, what factors they took into account in arriving at their opinion, including a statement by them, if they desire, that they took into account a factor of "reproduction cost less depreciation," but without being permitted to state their figures or computations. If the government elects to cross examine on this matter, its questions, may or may not, open the door to a complete statement of figures by the expert.

We reason that if an expert states that in arriving at an opinion of fair market value of a leasehold or fee that "reproduction cost less depreciation" would at least be one of the factors, although not the controlling factor, in arriving at his opinion, it is difficult, as a matter of logic, to see how you can keep the expert from giving his reasons, even though one might think he was wrong. As we have said several times, carrying this logic to a strict conclusion, if the expert said, "I went out and looked at the stars and they told me that this was fair market value"—and this was one of his reasons, why should he not be permitted to so state. On cross examination it can be exposed as an utterly fallacious reason, and his testimony would be destroyed.

There are cases which say that these absurdities should not be considered at all and where opinions are based upon them, the testimony should be stricken.

Is it inconsistent not to permit defendants to put into evidence, the dollars and cents value of "reproduction cost," as bearing on fair market value, yet permit defendants to ask their expert generally, whether he considered this as a factor? We do not think so.

There is a difference between permitting an expert to list any numbers of factors that he took into account and, at the same time, preventing the defendant who called that expert from offering direct evidence of every one of those factors. If that occurred it would interminably drag out these cases. When an expert on the witness stand lists 20 factors that led to his opinion, if the party was then permitted to put on direct evidence of every one of those factors, it would upset the rule that the expert is entitled to rely on hearsay information. He can say that he talked to owners of certain property and he inquired here and there; that he talked to real estate men, all of which is in one sense hearsay, but this, under our system of trying condemnation cases, has been considered proper,—not as direct evidence of those facts themselves but as things the expert took into account in arriving at his opinion; things he took into account in becoming an informed expert. Therefore, if the court permitted direct evidence on such a factor, it is only logical that the contentions of the landowners here would lead to further problems. They offer now direct evidence on one factor. Tomorrow they may want direct evidence of six more factors. And you would be forever trying the condemnation case.

Finally, to permit direct evidence of reproduction cost less depreciation, one of the factors, where many of the other factors are only mentioned by the expert, places that factor in a position out of all proportion to the position that it should have in the consideration of the jury. Instead of being another factor, it becomes by the way the evidence comes in, the big factor. Because here are figures and details on one factor. Here are many other factors with only a sketchy background. Permitting that kind of evidence on one factor would tend to prejudice the jury. This coupled with the other things here said, leads to the conclusion that we are not being inconsistent when we say defendants can do one but not the other.